IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED REFINING CO., : | |
| : | |
| Plaintiff, : | |
| : | CIVIL ACTION NO.: |
| v. : | |
| : | 2:13-CV-909 |
| NATIONAL UNION FIRE INSURANCE : | |
| COMPANY of PITTSBURGH, et al., : | |
| : | |
| Defendants. : | |

MEMORANDUM

**Judge C. Darnell Jones, II**                                                                            **December 12, 2013**

Pending before the court is defendants' motion to dismiss plaintiff's amended complaint on the following grounds: (1) all claims in the complaint are subject to arbitration pursuant to plaintiff's insurance policy, (2) plaintiff has failed to state a claim for which relief can be granted in Counts II and III, (3) New York law applies to these claims pursuant to a choice of law clause, and (4) plaintiff filed an untimely complaint. (Doc. No. 13 (Def. Br.)) Defendants also move to stay proceedings on those claims that do not merit arbitration to the extent that any exist. (Doc. No. 13 (Def. Br.)) After a thorough review of the record, the court will **GRANT** the motion **IN PART** and **DENY IN PART**. The motion will be **GRANTED** as to Counts I, II, and IV and **DENIED** as to Count III. Plaintiff **SHALL SUBMIT** all dismissed claims to **ARBITRATION** in accordance with the terms of its insurance policy. The court will **STAY** the remaining claims **PENDING COMPLETION OF ARBITRATION**.

BACKGROUND

This case arises out of an insurance coverage dispute in which plaintiff claims that defendants are liable for business losses incurred by plaintiff when a ruptured pipeline delayed shipments of crude oil to plaintiff's refining facilities. The parties' relationship began in 2009 when each of the

following insurance companies sold plaintiff a "quota share" of a business insurance policy: National Fire Insurance Company of Pittsburgh, Allianz Global Risks U.S. Insurance Company, Certain Underwriters at Lloyd's of London, XL Insurance (Bermuda) Ltd., and Swiss Re International SE.[1] (Doc. No. 11, at 4-5 (Am. Compl.))

Plaintiff's insurance policy was an "all-risk" policy and covered "the property insured hereunder against all risks of direct physical loss or damage occurring during the term of the policy from any external cause, except as hereinafter excluded." (Doc. No. 11, at 6 (Am. Compl.)) The policy further provided coverage for:

> All Risk of Direct Physical Loss or Damage to all Real or Personal Property of every kind and description including but not limited to . . . Time Element including but not limited to Business Interruption (including Interdependency), Extra Expense, Leasehold Interest, Rental Insurance, Commission Profits and Royalties, Contingent Time Element, and/or as may be more fully defined in this Policy Wording.

(Doc. No. 11, at 5 (Am. Compl.))

The contract also contained "Contingent Business Income Coverage" as follows:

> A.  This policy covers against loss resulting directly from the necessary interruption of business by the peril(s) insured against during the term of this

---

[1] The complaint states:

15. Defendants National Union, Lloyd's (through Syndicate 1183), and Allianz sold 32% of the insurance coverage at issue by subscribing to Manuscript Policy Form No. ARS4975, which was drafted by AON Risk Services. . . .

16. Defendant XL sold 11.5% of the insurance coverage at issue under XL Policy No. XLPRP-606172-09, a true and correct copy of which is attached hereto as Exhibit C.

17. Defendant Swiss Re sold 10% of the insurance coverage at issue under Swiss Re Policy No. EL0900297, a true and correct copy of which is attached hereto as Exhibit D.

18. In addition to that sold by Syndicate 1183, Lloyd's sold 46.5% of the insurance coverage at issue under Policy No. EL0900295 and Policy No. EL0900296. . . .

>    policy, at locations of the Insured as described under the **Property Insured**, caused by direct physical damage of the time insured against to
>
>    1.  Real or personal property of the type covered at CONTRIBUTING PROPERTY(IES) not operated by the Insured which wholly or partially prevents the delivery of materials to the Insured;

(Doc. No. 11, at 6 (Am. Compl.))

Finally, the contract contained a clause concerning "Contingent Extra Expense Coverage":

>    A.  This policy covers the necessary Contingent Extra Expense, as hereinafter defined, incurred by the Insured in order to continue as nearly as practicable the normal operation of the Insured's business following damage to or destruction of real or personal property, by the peril(s) insured against during the term of this policy, at location of the insured as described under **Property Insured**, caused by the direct physical damage of the type insured against to:
>
>    1.  Real or personal property of the type covered at CONTRIBUTING PROPERTY(IES) not operated by the Insured which wholly or partially prevents the delivery of materials to the Insured or others for the account of the Insured.

(Doc. No. 11, at 6-7 (Am. Compl.))

Continent Extra Expense was defined by the agreement as:

>    The excess (if any) of the cost(s) incurred during the period of restoration, chargeable to the operation of the Insured's business, over and above the cost(s) that would normally have been incurred to conduct the business during the same period had no damage or destruction occurred.

(Doc. No. 11, at 7 (Am. Compl.))

Particularly important for purposes of defendants' currently pending motion to dismiss is the following clause governing arbitration:

>    27.  ARBITRATION CLAUSE
>
>    If the Insured and the Company fail to agree in whole or in part on the liability of the Insured or on the amount of loss or damage, each party shall, within twenty (20) days

> after the demand in writing by either party appoint a competent and disinterested arbitrator and the two chosen shall before commencing the arbitration select a competent and disinterested umpire. The arbitrators together shall so fail to agree, they will submit their differences to the umpire and the award in writing of any two, duly verified, shall determine the same, and be binding on both parties. The parties to such arbitration shall pay the arbitrators respectively appointed by them and shall bear equally the expenses of the arbitration and the charges of the umpire.

(Doc. No. 11, at 9-10 (Am. Compl.))

On July 26, 2010, Enbridge Energy discovered a rupture in Enbridge 6B, a 30-inch diameter pipeline owned by Enbridge and used to carry crude oil between the United States and Canada. (Doc. No. 11, at 7 (Am. Compl.)) As a result of the rupture, 1 million gallons of "heavy crude oil" leaked into a water source that ultimately emptied into the Kalamazoo River. (Doc. No. 11, at 9 (Am. Compl.)) The pipeline was immediately closed, and the Pipeline and Hazardous Materials Safety Administration issued a Corrective Action Order to Enbridge Energy Partners. (Doc. No. 11, at 9 (Am. Compl.)) As a result of the rupture, the pipeline was shut down until September 28, 2010, and United Refining received drastically reduced shipments of crude oil for some time thereafter. (Doc. No. 11, at 9 (Am. Compl.)) This disruption in oil shipments allegedly cost United Refining a total of $32 million dollars and led to a severe cash flow problem requiring the company to seek $45 million of additional funding from shareholders. (Doc. No. 11, at 9 (Am. Compl.))

On March 21, 2011, United Refining submitted a claim for Contingent Business Income and Continent Extra Expense losses in the amount of $20,568,792.[2] (Doc. No. 11, at 10 (Am. Compl.)) The defendant insurance companies hired defendants Crawford and Chartis to adjust, evaluate, and analyze United Refining's losses and claims. (Doc. No. 11, at 10-11 (Am. Compl.)) On March 23,

---

[2] Plaintiff explains that this sum was derived from subtracting the waiting period deductible ($10,515,042) from the total loss ($31,083,833).

2011, Crawford issued a "preliminary coverage analysis" in which it suggested that the losses resulting from the Enbridge Rupture were not covered by plaintiff's insurance policy. (Doc. No. 11, at 10-11 (Am. Compl.)) Subsequent negotiations intended to resolve the dispute proved unsuccessful, and, on October 10, 2011, Chartis and Crawford formally denied plaintiff's claim on the basis that the losses were incurred within the 45 day waiting period and, therefore, not covered. (Doc. No. 11, at 11 (Am. Compl.)) Plaintiff claims that it paid premiums totaling $2,150,000 between 2009 and 2010 and was otherwise in full compliance with its obligations under the insurance policy. (Doc. No. 11, at 4 (Am. Compl.))

Plaintiff filed suit January 24, 2013, in the Court of Common Pleas, Philadelphia County, and defendant removed the action to the U.S. District Court for the Eastern District of Pennsylvania on February 19, 2013. (Doc. No. 13, at 9 (Def. Brief); Doc. No. 17, at 7 (Pl. Brief)) Defendants subsequently filed a motion to dismiss and plaintiff responded by filing an amended complaint mooting the earlier motion. The amended complaint brings breach of contract, intentional interference, and bad faith claims against various defendants, including defendant insurers and defendant appraisers Chartis and Crawford & Company. (Doc. No. 11, at 12-19 (Am. Compl.)) Defendants filed a second motion to dismiss on April 4, arguing that 1.) plaintiff's claims are subject to dismissal pursuant to the arbitration clause in the insurance policy, 2.) the complaint failed to properly allege intentional conduct in conjunction with plaintiff's intentional interference claims, 3.) New York law, not Pennsylvania law, applied to plaintiff's bad faith claim, and 4.) several of plaintiff's claims are time barred. Defendants also moved to stay any nonarbitrable claims. The motion has been fully briefed and is ripe for disposition. (Doc. No. 13 (Def. Brief); Doc. No. 17 (Pl. Brief); Doc. No. 27 (Reply Brief)).

**DISCUSSION**

**A.) Counts I, II, & IV Will Be Dismissed and Arbitration Ordered**

Contractual arbitration agreements "evidencing a transaction involving commerce" are governed by the Federal Arbitration Act ("FAA"). 9 U.S.C. §§2 et seq. In determining whether the FAA compels arbitration of a claim, a court must determine "(1) whether there is a valid agreement to arbitrate between the parties and, if so, (2) whether the merits-based dispute in question falls within the scope of that valid agreement." *Walker v. Morgan Stanley Smith Barney LLC*, 10-CV-2378, 2011 WL 1603490, *2 (quoting *Century Indem. Co. v. Certain Underwriters at Lloyd's*, 584 F.3d 513, 527 (3d Cir. 2009)). In the event an arbitration clause is found to be valid, "[t]he FAA empowers district courts to compel arbitration in accordance with agreements and to enforce awards." *Century Indem. Co.*, 584 F.3d at 523. The FAA provides that arbitration agreements are "valid, irrevocable, and enforceable" and reflects a "strong federal policy favoring arbitration." 9 U.S.C. §2 (arbitration agreements valid); *Mitsubishi Motors Corp. v. Soler Chrysler Plymouth*, 473 U.S. 614 (1985) (federal policy favors arbitration); *Century Indem. Co. v. Certain Underwriters At Lloyd's*, 584 F.3d 513, 522 (3d Cir. 2009) (Congress designed the FAA to overrule the judiciary's longstanding reluctance to enforce agreements to arbitrate and its refusal to put such agreements on the same footing as other contracts."). The Supreme Court has said, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, at 24-25 (1983).

The clause at issue in this case states:

> If the Insured and the Company fail to agree in whole or in part on the liability

> of the Insured or on the amount of loss or damage, each party shall, within twenty (20) days after the demand in writing by either party appoint a competent and disinterested arbitrator and the two chosen shall before commencing the arbitration select a competent and disinterested umpire. The arbitrators together shall so fail to agree, they will submit their differences to the umpire and the award in writing of any two, duly verified, shall determine the same, and be binding on both parties. The parties to such arbitration shall pay the arbitrators respectively appointed by them and shall bear equally the expenses of the arbitration and the charges of the umpire.

(Doc. No. 11 (Am. Compl.), Ex. B1, at 16; Ex. C1, at 15; Ex. D1, at 15; E1, at 15; F1, at 15.)

Plaintiff's objections to the application of this clause are threefold. First, plaintiff argues that the language of the contract dictates that it only applies to disputes over the liability of the insured, not the insurer as defendants contend. (Doc. No. 17, at 13-16 (Pl. Brief)) Second, plaintiff argues that the clause is actually an appraisal clause masquerading as an arbitration clause and therefore only applies to disputes over the amount of the loss, not coverage. (Doc. No. 17, 9-13 (Pl. Brief)) Finally, plaintiff contends that, even if the clause requires arbitration, it only applies to Count I, the breach of contract claim, because the terms of the agreement only dictate that contract disputes are arbitrable. (Doc. No. 17, 18-23 (Pl. Brief))

As to the first challenge, the court is not convinced by plaintiff's argument that insurer disputes are not arbitrable. It is true, as plaintiff points out, that the contract only states that disputes over "the liability of the Insured" are arbitrable. (Doc. No. 11, Exh. B, at 16 (Am. Compl.)) Ordinarily the plain language of a contract is given great deference, and courts are hesitant to look beyond the four corners of the document to ascertain the parties' intent. *Illinois Nat. Ins. Co. v. Wyndham Worldwide Operations, Inc.*, 653 F.3d 225, 231 (3d Cir. 2011) ("Generally, when interpreting an insurance policy, courts should give the policy's words their plain, ordinary meaning.") On the other hand, "the intention of the parties [to a contract] is paramount and the court

will adopt an interpretation which under all circumstances ascribes the most reasonable, probable, and natural conduct of the parties, bearing in mind the objects manifestly to be accomplished." *Aetna Casualty & Sur. Co. v. Richard I. Rubin & Co.*, 94-CV-3024, 1994 WL 683376, *3 (E.D.Pa. Nov. 29, 1994) (quoting *Village Beer & Bev. v. Vernon D. Cox & Co.*, 475 A.2d 117, 121 (Pa.Super.Ct. 1984)).

In *Aetna Casualty*, the court was faced with an arbitration clause that, exactly like the one before this court, stated, "If the Insured and the Company fail to agree in whole or in part *on the liability of the insured or the amount of loss or damage*, each party shall, within thirty (30) days after the demand in writing by either party appoint a competent and disinterested arbitrator . . ." *Id.* at 2. Despite contractual language to the contrary, the court determined that the provision applied to disputes over the liability of the insurer, not the insured:

> Following these principles, I conclude that the Policy's arbitration clause is more reasonably understood as pertaining to the liability of [the insurer] rather than to the liability of [the insured]. The Policy's main purpose is to set forth the terms of [the insurer's] insurance coverage; consequently, disagreement between the parties over [the insurer's] liability would be a foreseeable circumstance under the Policy. In contrast, it is difficult to envision how disputes over [the insured's] liability would arise. Although [the insured] is responsible under the Policy for paying insurance premiums, contention over [the insured's] payments seem unlikely given that the Policy already provides for [the insurer's] termination of the Policy upon non-payment by [the insured].

*Id.* at 4.

The court's interpretation of the arbitration clause in *Aetna Casualty* is compelling. As a practical matter, it is unlikely that disputes will arise over the liability of the insured because the insured's liability only encompasses a predetermined premium payment. It is difficult to imagine how a dispute would arise from such a tractable duty unless, of course, the parties disagreed about whether payment was made. On the other hand, disputes over the liability of an insurer tend to be frequent

because of the difficulty of drafting an insurance policy that accounts for every hypothetical insurable event. Therefore, the court believes the parties intended the arbitration clause to apply to the liability of the insurer.

Furthermore, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolve in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Aetna Casualty & Sur. Co. v. Richard I. Rubin & Co.*, 09-CV-3024, 1994 WL 683376, *3 (E.D.Pa. 1994). That policy "applies with special force in the field of international commerce," as is the situation here.[3] *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 523 (3d Cir. 2009). As such, the court will read the arbitration clause in the parties' insurance contract to be applicable to disputes concerning insurer liability.

Plaintiff next argues that the clause at issue is an appraisal clause, not an arbitration clause, but the language of the contract discredits this argument. First, and most importantly, the provision is titled "Arbitration Clause" and states that parties "shall, within twenty (20) days after the demand in writing by either party appoint a competent and disinterested arbitrator." (Doc. No. 11 (Am. Compl.), Ex. B1, at 16; Ex. C1, at 15; Ex. D1, at 15; E1, at 15; F1, at 15.) On the other hand, the word appraisal is found nowhere in the clause. Use of the words "abritration" and "arbitrator" overwhelmingly evidence the intent of the parties to enter into an arbitration agreement, not an appraisal agreement. Furthermore, as plaintiff points out, "an appraisal usually involves only a

---

[3] The complaint alleges that Lloyd's of London is comprised of syndicates whose members are citizens of the United Kingdom of Great Britain and Northern Ireland. (Doc. No. 11, at 20 (Am. Compl.)) Defendant XL Insurance is a corporation organized under the laws of Bermuda and has a principal place of business in Hamilton, Bermuda. (Doc. No. 11, at 20 (Am. Compl.))

9

determination of the amount of loss sustained by the insured." (Doc. No. 17, at 10 (Pl. Brief); *Williamson v. Chubb Indem. Ins. Co.*, 11-CV-6476, 2012 WL 760838, *4 (E.D.Pa. March 8, 2012) ("A condition precedent to appraisal is that there be an admission of liability and a dispute only as to the dollar value of the loss.")). The language at issue in this case clearly contemplates a determination of "the liability of the Insured or on the amount of loss or damage." While plaintiff argues that the word "liability" is synonymous with "appraisal value,"[4] Pennsylvania contract law dictates that the word's juxtaposition to the phrase "amount of loss or damage" indicates that the parties intended the word "liability" to refer to coverage disputes. *Sloan & Co. v. Liberty Mutual Ins. Co.*, 653 F.3d 175, 181 (3d Cir. 2011) ("Moreover, we agree that courts should not interpret contracts in a way that renders at least one clause superfluous or meaningless."); *MacKay v. Donovan*, 10-CV-218, 2012 WL 460305, *3 (E.D.Pa. Feb. 14, 2012) ("The Court should interpret each provision in light of the contract as a whole and in a manner that will not render another provision superfluous or without force."). If the court interpreted the word "liability" to mean "amount of loss or damage," as plaintiff argues, the word would be redundant:

> If the Insured and the Company fail to agree in whole or in part on the **liability of the Insured or on the amount of loss or damage**, each party shall, within twenty (20) days after the demand in writing by either party appoint a competent and disinterested arbitrator and the two chosen shall before commencing the arbitration select a competent and disinterested umpire.

---

[4]Plaintiff states:

> Even assuming there is an "error" in the language of the agreement, it is more likely that the phrase "liability of the insured" was an error that should have stated "loss of the insured." Such error would be consistent with the understanding that the "arbitration clause" is actually an appraisal clause applicable only to the valuation of the loss.

(Doc. No. 17, at 14 n. 5 (Pl. Brief))

(Doc. No. 11, Exh. B, at 16 (Am. Compl.))

Because Pennsylvania law requires that courts read contracts in a way that avoids superfluous words and phrases, the court finds that the word "liability" means disputes over coverage, not disputes over the amount of loss or damage claimed by the insured. Therefore, the motion to dismiss will be **GRANTED** as it relates to Count I.

Finally, plaintiff argues that, even if the court finds that the insurance policy contains an arbitration agreement, that agreement only governs breach of contract disputes between the parties, not tort claims. The court disagrees with plaintiff's conclusion and finds that several of the tort claims are arbitrable. In *Nova CTI Caribbean v. Edwards*, this district found in a similar case that a claim for interference with contractual relations was arbitrable pursuant to a contractual arbitration agreement. *Nova CTI Caribbean v. Edwards*, 03-CV-5319, 2004 WL 35759, *4-5 (E.D.Pa. Jan. 8, 2004). In that case, the defendant, Ms. Edwards, entered into an employment agreement with plaintiff Nova CTI Caribbean that contained a non-compete clause and an arbitration agreement. *Id.* at 1. When the relationship between the parties soured, the defendant resigned from her position with the company and began working for Nand Persuad, a company that had entered into a joint venture with Nova CTI. *Id.* When the joint venture fell apart, Nova CTI Caribbean filed suit against Ms. Edwards claiming that she had interfered with the joint venture and breached the non-compete clause of her employment contract by doing so. *Id.* Ms. Edwards filed a motion to dismiss, arguing, inter alia, that the interference claim was governed by the arbitration clause. *Id.*

The district court interpreted the arbitration clause broadly and found in favor of Ms. Edwards. In holding that the dispute was arbitrable, Judge Kelly explained that courts should "focus

on the factual underpinnings of the claim instead of the legal theory in deciding if the claim falls within the scope of the arbitration clause." *Id.* at 4; *see also Troshak, II v. Terminix Int'l Co., L.P.*, 98-CV-1727, 1998 WL 401693, *6 (E.D.Pa. July 2, 1998). In applying this principle, the court determined:

> In the instant case, the allege interferences arise out of the same facts as the breach of contract claim. Specifically, Edwards' interference with the joint venture between Nova CTI and Nand Persuad allegedly occurred when Edwards allegedly breached the non-compete clause by forming an employment relationship with Nand Persuad. Further, Edwards' alleged interference with Nova CTI's RBI account and misappropriation of that client was a direct result of Edwards forming a[n] employment relationship with Nand Persuad in violation of the Agreement.

*Nova CTI Caribbean*, 2004 WL 35759, at *4.

In the present case, plaintiff's interference claim in Count II similarly arises out of its breach of contract claim. Defendant National Union entered into an "all-risk manuscript insurance policy" with plaintiff that covered the plaintiff from loss from September 1, 2009 until September 1, 2010. (Doc. No. 11, at 21 (Am. Compl.)) Plaintiff alleges that National Union thereafter refused to pay its pro rata portion of the policy when plaintiff filed the claim at issue in this case. (Doc. No. 11, at 30 (Am. Compl.)) It was because of National Union's refusal, plaintiff claims, that other insurers refused to pay their quota shares as well. (Doc. No. 11, at 30 (Am. Compl.)) Therefore, the alleged interference claim is directly related to and National Union's status as an insurer, a signor of the contract at issue, and a subscriber to the arbitration clause that stands at the center of this dispute. As such, Count II of the complaint is arbitrable, and the court will **GRANT** defendants' motion to dismiss as it relates to Count II.

The same cannot be said for the interference-with-contractual-relations claim in Count III, which plaintiff brought against defendants Chartis and Crawford & Company. The complaint

explains that Chartis was "in the business of selling insurance policies" and Crawford "was engaged as an insurance adjuster." Neither defendant is alleged to have purchased a share of the insurance policy at issue in this case. As such, it does not appear that plaintiff ever entered into an arbitration agreement, or for that matter, had any contractual relationship with either of these defendants. Under these circumstances, it would be improper to find that Count III is arbitrable.

Defendants argue in the alternative that Count III should be subject to arbitration under a theory of estoppel. More specifically, defendants argue "the circuits have been willing to estop a signatory from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." (Doc. No. 13, at 15 (Def. Brief) (quoting *Thomson-CSF, S.A. v. AAA*, 64 F.3d 773 (2d Cir. 1995)). Furthermore, the Third Circuit has found that even an non-signatory may be bound by an arbitration clause when the non-signatory "knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement." *E.I. DuPont de Nemours and Co. v. Rhone Poulenc Fiber and Resin Intermediaries, S.A.S.*, 269 F.3d 187, 199 (3d Cir. 2001). Neither of these cases apply here, however, because plaintiff did not exploit an arbitration agreement and the issue to be resolved in Count III is not so intertwined as to require arbitration. Plaintiff has vehemently opposed arbitration throughout the pendency of this matter. Furthermore, while Count III depends, in part, on a determination of Count I, an arbitrable claim, the court finds it sufficient to stay Count III until arbitration is complete, especially in light of the fact that it does not appear from the complaint that plaintiff and defendants Chartis and Crawford ever had a contractual relationship of any kind, let alone an arbitration agreement .

The policy of estoppel is supported by the notion of fairness. As the Eastern District of

Pennsylvania explained in *Philadelphia Flyers, Inc. v. Trustmark Ins. Co.*:

> [A] party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's abritration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him. To allow [a party] to claim the benefit of the contract and simultaneously avoid its burdens would both disregard equity and contravene the purposes underlying enactment of the Arbitration Act.

*Philadelphia Flyers, Inc. v. Trustmark Ins. Co.*, 04-CV-2322, 2004 WL 1529167 (E.D.Pa. July 6, 2004).

Here, defendants have not argued that plaintiff relied on the arbitration clause when it was beneficial and disclaimed the provision when it was detrimental to its interests. Furthermore, defendants have not convinced the court that the basic fairness principle underlying estoppel dictates that Count III must be arbitrated. The court will **DENY** the motion to dismiss as it related to Count III.

As for Count IV, the court finds that plaintiff's bad faith claim is arbitrable for the reasons the court found Count II arbitrable. Bad faith insurance claims, by definition, must arise out of the facts underlying breach of insurance contract claims. As such, count IV is arbitrable and the court will **GRANT** the motion to dismiss as it relates to Count IV.

**B.) The Remaining Claims Will Be Stayed Pending Arbitration**

As defendants point out in their brief in support, (Doc. No. 13, at 16 (Def. Brief)), interference-with-contractual-relations claims usually, if not always, require a showing of breach of contract. *Foster v. Churchill*, 87 N.Y.2d 744 (1996) (requiring existence and breach of valid contract); *see also Phillips v. Selig*, 959 A.2d 420, 428 (Pa.Super.Ct. 2008) (requiring existence of

contract and actual legal damage).[5] The interference claim in Count III, the only claim not subject to arbitration, depends on the outcome of arbitration as to Count I, the breach of contract claim. As such, this case will be **STAYED** pending completion of arbitration.

## CONCLUSION

In light of the foregoing, the motion to dismiss will be **GRANTED** as to Counts I, II, and IV. The motion to dismiss will be **DENIED** as to Count III. Plaintiff **SHALL SUBMIT** all dismissed claims to **ARBITRATION** in accordance with the terms of its insurance policy. All remaining claims will be **STAYED** pending **COMPLETION OF ARBITRATION**.

BY THE COURT:

/s/ C. Darnell Jones, II

**C. DARNELL JONES  II,  J.**

---

[5] The parties dispute whether Pennsylvania or New York law applies, an issue on which the court will withhold a decision until the parties complete arbitration.